303 S.E.2d 726

**Helen HALL, Widow of Jesse L. Hall**

v.

**STATE WORKMEN'S COMPENSATION COMMISSIONER and Wheeling-Pittsburgh Steel Corporation.**

**No. 15709.**

Supreme Court of Appeals of West Virginia.

May 25, 1983.

---

Barnes, Watson, Cuomo, Hinerman & Fahey, Frank Cuomo, Jr. and Mark B. Chernenko, Wellsburg, for appellant.

Schrader, Stamp, Byrd, Byrum, Johnson & Companion, Ronald B. Johnson, Wheeling, for appellee.

McHUGH, Justice:

This is an appeal by Helen Hall, the widow of Jesse L. Hall, from a final decision of the Workmen's Compensation Appeal Board, entered August 31, 1982, which affirmed an order of the Workmen's Compensation Commissioner. That order denied the appellant's workmen's compensation claim. This Court has before it the petition for appeal, all matters of record, and the briefs and oral argument of counsel.

After working at the Wheeling-Pittsburgh Steel Corporation's coke plant in Follansbee, West Virginia for over 30 years, Jesse L. Hall, on June 17, 1975, filed a claim for occupational pneumoconiosis disability benefits with the Workmen's Compensation Fund.[1] On June 23, 1975, Mr. Hall committed suicide. His claim was dismissed by the Commissioner on July 26, 1976.

The appellant filed an application for dependent's benefits with the Workmen's Compensation Fund on September 21, 1976. The Commissioner on January 10, 1977, denied her application, holding that Mr. Hall's "death was not due to occupational pneumoconiosis, nor was occupational pneumoconiosis a major contributing factor to his death...." Following a protest by the appellant, the Commissioner on March 8, 1978, affirmed the earlier ruling of January 10, 1977. The appellant appealed the Commissioner's order to the Appeal Board asserting that new evidence had been discovered concerning the mental state of the decedent at the time he committed suicide. The Appeal Board reversed the Commissioner and on May 29, 1979, remanded the claim to the Commissioner for the taking of additional evidence.

After taking additional evidence the Commissioner again, by an order entered

---

1. The legislature on February 11, 1983, amended *W.Va.Code*, 23–1–1, effective May 12, 1983, changing the term "Workmen's" to "Workers'" in chapter 23 of the Code. For example, the Workmen's Compensation Commissioner has been changed to the Workers' Compensation Commissioner.

on August 4, 1981, denied the appellant's claim. The appellant appealed that order, however, on August 31, 1982, the Appeal Board affirmed the Commissioner's order and held that Mr. Hall's suicide was not "due to occupational pneumoconiosis [nor was] ... occupational pneumoconiosis ... a major contributing factor in the employee's self-inflicted injury."

The issue now before us is whether Mr. Hall's suicide is a compensable claim under the provisions of the West Virginia compensation statutes.

■ *W.Va.Code,* 23–4–2 [1969] expressly states that an employee's death, which results from a self-inflicted injury, is not compensable.[2] However, the general rule, to which the overwhelming majority of jurisdictions adhere, allows compensation if a substantial causal relationship can be shown to exist between a worker's employment and that worker's suicide.[3] The most common language used to describe this relationship is that the worker's death must "arise out of and in the course of the employment."[4] 82 Am.Jur.2d, *Workmen's Compensation,* § 241 (1976).

An excellent discussion concerning a worker's suicide can be found in *The Law of Workmen's Compensation* by Arthur Larson. A portion of that discussion states:

Most cases in this field present the same pattern of facts: a severe, or extremely painful, or hopelessly incurable injury, followed by a deranged mental state ranging from depression to violent lunacy, followed in turn by suicide. The basic legal question seems to be agreed upon by almost all authorities: It is whether the act of suicide was an intervening cause breaking the chain of causation between the initial injury and the death.

1A Larson *Workmen's Compensation* § 36.10.

It is well accepted that a worker's suicide is compensable if two facts are established: (1) an original work-related injury must be sustained by the worker,[5] and (2) that injury must, in turn, cause a state of mental derangement in the injured worker.[6] The controversy among courts which have addressed the issue concerns the standard which should be applied when determining whether a suicide claim will be held compensable.

Presently, three different standards have been used in other state jurisdictions when determining whether the suicide of a worker will be held compensable. They are: (1) the *Sponatski* rule, (2) the New York rule and (3) the chain of causation rule.

The *Sponatski* rule originated in *Sponatski's Case,* 220 Mass. 526, 108 N.E. 466 (1915). In that case molten lead splashed into the eye of a worker. Four weeks later the worker jumped from a hospital window and killed himself. The Massachusetts Court created the rule when it held that:

[W]here there follows as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy 'without

---

2. *W.Va.Code,* 23–4–2 [1969] provides, in part: "[N]o employee or dependent of any employee shall be entitled to receive any sum from the workmen's compensation fund ... on account of any personal injury to or death to any employee caused by a self-inflicted injury, [or] willful misconduct...."

3. *See, e.g., Cudahy Packing Company of Nebraska v. Parramore,* 263 U.S. 418, 44 S.Ct. 153, 68 L.Ed. 366 (1923); *Malacarne v. Yonkers Parking Authority,* 41 N.Y.2d 189, 391 N.Y.S.2d 402, 359 N.E.2d 992 (1976); *Lucas v. Hartford Accident and Indemnity Company,* 552 S.W.2d 796 (Tex. 1977). *See generally* 82 Am.Jur.2d, *Workmen's Compensation,* § 240 (1976).

4. The language in *W.Va.Code,* 23–4–1 [1974] reads "in the course of and resulting from ... covered employment." While this code section has been amended since the decedent's suicide, the quoted language has remained unchanged.

5. *See, e.g., Whitehead v. Keene Roofing Co.,* 43 So.2d 464 (Fla.1949); *See generally* Annot., 15 A.L.R.3d 616, § 7(a) (1967). A small number of courts have also allowed compensation where the mental disorder and subsequent suicide resulted from work connected activities, such as mental strain and overwork. *See, e.g., Burnight v. Industrial Accident Commission,* 181 Cal. App.2d 816, 5 Cal.Rptr. 786 (1960).

6. Larson, *supra,* § 36.

conscious volition to produce death, having knowledge of the physical nature and consequences of the act,' then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary willful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act even though choice is dominated and ruled by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury.

220 Mass. at 530, 108 N.E. at 468.

However, the *Sponatski* rule has been criticized over the years. This criticism has centered around the application of the criminal law standard of insanity, i.e., to a worker's compensation case.[7] The argument is that in a criminal law murder case a defendant's understanding, i.e., knowledge of the consequences, is a crucial element, since it is necessary to the establishment of criminal intent. In a compensation suicide case, however, the issue is one of causation, not understanding. The *Sponatski* rule [8] has received further criticism because it applies the tort concept of an independent intervening cause when the element of fault was intentionally eliminated from the worker's compensation laws.[9]

Criticism of the *Sponatski* rule has been so pervasive that few, if any, of the jurisdictions which initially embraced the rule currently apply it.[10] Instead, those jurisdictions adhere to modified versions of the rule.[11] The cases in those jurisdictions generally have eliminated the "knowledge of the consequences" requirement and give a flexible meaning to "uncontrollable impulse." Larson, *supra*, § 36.22.

The second standard is the New York rule, which was established by *Delinousha v. National Biscuit Company*, 248 N.Y. 93, 161 N.E. 431 (1928). The New York Court of Appeals held:

> Death benefits are allowed if the injury results naturally and unavoidably in disease, and the disease causes death. This is so if the injury causes insanity from gangrenous poisoning or otherwise, and the insanity directly causes suicide; in other words, if the suicide is not the result of discouragement, of melancholy, of other sane conditions, but of brain derangement. If that is the cause, an award may be made. Death is then the proximate and direct result of the accident within the meaning of the statute.

248 N.Y. at 96, 161 N.E. at 432.

While *Delinousha*, *supra*, impliedly required the "brain derangement" aspect of the holding to be related to physical damage to the brain itself,[12] later cases [13] have not been so stringent. *Maricle v. Glazier*, 283 A.D. 402, 128 N.Y.S.2d 148, *aff'd*, 307 N.Y. 738, 121 N.E.2d 549 (1954), held that where it was shown that "a condition of psychosis, depressive in character, of a

---

7. Larson notes this element can be traced to the criminal law test of insanity set forth in *M'Naghten's Case*, 8 Eng.Rep. 718 (1843). Larson, *supra*, § 36.22. *See also* Annot., 15 A.L. R.3d 616, 622 (1967).

8. The decision in *Sponatski's Case, supra*, was founded upon *Daniels v. New York, New Haven and Hartford Railroad Company*, 183 Mass. 393, 67 N.E. 424 (1903), a tort case.

9. *See generally* Larson, *supra*, § 36.22, Annot., 15 A.L.R.3d at 622, 630.

10. Massachusetts legislatively changed the rule when it amended its compensation statute in 1937 allowing compensation when "due to the injury, the employee was of such unsoundness of mind as to make him irresponsible for his act of suicide." Mass.Stat. Ch. 370, § 2 (1937). The

New Jersey court recently rejected the rule when it adopted the chain of causation rule [discussed *infra*] in *Kahle v. Plochman*, 85 N.J. 539, 428 A.2d 913 (1981). For a more complete discussion concerning inroads into the *Sponatski* rule, *see* Larson, *supra*, § 36.22 and Annot., 15 A.L.R.3d at 622, 630.

11. *See, e.g., Saunders v. Texas Employers' Insurance Association*, 526 S.W.2d 515 (Tex.1975). *See generally* Larson, *supra*, § 36.22.

12. The Court in *Delinousha, supra*, defined insanity as "a symptom of some functional derangement of tissues of the brain." 248 N.Y. at 95, 161 N.E. at 432.

13. *See, e.g., Aponte v. Garcia*, 279 A.D. 269, 109 N.Y.S.2d 761 (1952).

mental disease, and of a mental or brain derangement affecting decedent's sanity, all of which could exist independently of any physical brain tissue degeneration or pathological indications" an award of compensation could be made. 128 N.Y.S.2d at 151.

More recently, *Reinstein v. Mendola,* 39 A.D.2d 369, 334 N.Y.S.2d 488 (1972), while conceding that *Delinousha, supra,* was still the law of New York, liberalized the rule even more. In that case the New York Supreme Court held: "If all the elements present are sufficient to establish a pattern of mental deterioration causally related to an industrial accident which culminates in a suicide, the requirement of a specific hard and fast diagnosis of the decedent's mental state is unnecessarily restrictive." 334 N.Y.S.2d at 490. Moreover, in its analysis the Court found that "a finding of psychosis" was not necessary before compensation could be awarded, provided that "a causal connection of death by suicide and the accident sustained by [the] decedent" is shown. 334 N.Y.S.2d at 490.

While the New York rule is not as restrictive as it was once thought to be, we find only one other jurisdiction, Louisiana, which follows it.[14]

The third standard, to which the majority of jurisdictions adhere, is the chain of causation rule.[15] This rule is perhaps best presented in *Whitehead v. Keene Roofing Co.,* 43 So.2d 464 (Fla.1949). In that case the Florida Court held:

[I]n those cases where the injuries suffered by the deceased result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, his suicide cannot be considered 'wilful' within the meaning and intent of the Act.

There is no force to the argument, propounded by some courts, that the act of suicide is an independent intervening cause of the death of the workman, thus breaking the chain of causation from the injury to the death of the deceased. While it may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; that the suicide was merely an act intervening between the injury and the death, and part of an unbroken chain of events from the injury to the death, and not a *cause* intervening between the injury and death.

43 So.2d at 465.

In *Burnight v. Industrial Accident Commission,* 181 Cal.App.2d 816, 5 Cal. Rptr. 786 (1960), the California Court expressed approval of the chain of causation rule when it held that "in determining whether there is a direct causal connection between an industrial injury and a suicide, the trier of the fact must, in effect, answer this question, was the injury a proximate cause of the suicide or was the suicide merely contemporaneous or coincident with the injury?" 181 Cal.App.2d at 828, 5 Cal. Rptr. at 794.

The *Burnight* Court also acknowledged the role which modern psychiatry plays in a compensation suicide case. The Court found that mental disorders, such as the manic depressive condition suffered by the decedent in that case, can operate "to break down rational mental processes, placing the person afflicted in a mental state in which death actually seems more attractive than living, and in which he may not only have a conscious volition to produce death, but be eager to do so." 181 Cal.App.2d at 826, 5 Cal.Rptr. at 793.[16]

Moreover, the California Court stated:

**14.** *Soileau v. Travelers Insurance Company,* 198 So.2d 543 (La.App.), *writ refused* 250 La. 978, 200 So.2d 665 (1967).

**15.** *See, e.g., Graver Tank & Manufacturing Company v. Industrial Commission,* 97 Ariz. 256, 399 P.2d 664 (1965); *Beauchamp v. Workmen's Compensation Appeals Board,* 259 Cal.App.2d 147, 66 Cal.Rptr. 352 (1968); *Trombley v. Cold-*

water *State Home and Training School,* 366 Mich. 649, 115 N.W.2d 561 (1962). *See generally* Larson, *supra,* § 36.30.

**16.** *See* Morgan, *Physiological Psychology* 357 (1943), which concerns the ability of pain to break down the rational mental processes.

It is unreasonable and unrealistic to hold that suicide occurring when the employee is in such a state is not the result of the industrial injury when the manic depressive state is. If suicide is a result which may be expected from a manic depressive condition, how can such a result be said to be *intentionally* self-inflicted, even though the person may know what he is doing and its results?

181 Cal.App.2d at 827–28, 5 Cal.Rptr. at 794.

It is apparent that the chain of causation rule developed not only because of a general dissatisfaction with the harsh *Sponatski* rule but also from advances in modern psychiatry as well. The rule, furthermore, abandons the vague concepts of "delirium of frenzy" as expressed in *Sponatski,* and "brain derangement" as expressed in the New York rule.

We are of the view that of the three rules, the chain of causation rule is the one most consistent with the policy as stated by this Court in syllabus point 1 of *Johnson v. State Workmen's Compensation Commissioner,* 155 W.Va. 624, 186 S.E.2d 771 (1972): "Workmen's compensation statutes, being remedial, should be liberally construed in favor of the claimants for workmen's compensation benefits." We therefore adopt the chain of causation rule [17] and hold that an employee's suicide which arises in the course of and results from covered employment is compensable under *W.Va.Code,* 23–4–1 [1974], provided, (1) the employee sustained an injury which itself arose in the course of and resulted from covered employment, and (2) without that injury the employee would not have developed a mental disorder of such degree as to impair the employee's normal and rational judgment, and (3) without that mental disorder the employee would not have committed suicide.

However, as set forth in the above standard, and noted earlier in this opinion, before a worker's suicide can be compensable, not only must the worker suffer from a mental disorder, but the worker must also have sustained an injury which itself arose in the course of and resulted from covered employment, that in turn, resulted in the disorder. The general rule is that before a worker's suicide can be compensable:

[T]he suicide must be the result of some injury arising out of and in the course of employment. In other words, at the very outset there must be found an injury which itself arose out of and in the course of employment, and then the suicide must be traced directly to it. If there is no such employment connected injury setting in motion the causal sequence leading to the suicide, or when there are far stronger nonemployment influences accounting for the suicide, the suicide is [not compensable]. . . .

Larson, *supra,* § 36.40. *See also* Annot., 15 A.L.R.3d § 7(a).

■ Neither the Commissioner nor the Appeal Board determined whether Mr. Hall had, in fact, sustained a work-related injury, i.e., occupational pneumoconiosis.[18] If the initial work-related injury did not occur, the claim based upon the decedent's suicide is not compensable. If, however, it is shown that the decedent had occupational pneumoconiosis, then the two remaining requirements of the chain of causation rule must be met before the claim may be held compensable.

While the record contains extensive evidence concerning both the existence of occupational pneumoconiosis and the decedent's mental state this matter must be remanded to the Commissioner because

---

17. It should be noted that this Court first confronted the issue of whether a worker's suicide would be compensable in *Staubs v. State Workmen's Compensation Commissioner,* 153 W.Va. 337, 168 S.E.2d 730 (1969). However, because that case did not set forth what standard should be used when determining the compensability of a worker's suicide the Commissioner was not apprised of the standard we now adopt.

18. *W.Va.Code,* 23–4–1 [1974], defines the term "injury" to include occupational pneumoconiosis. While this code section has been amended since the decedent's suicide, this provision has remained unchanged.

"[o]n an 'appeal' from the Workmen's Compensation Appeal Board, this Court will not determine a question in the first instance which has not been fully developed or which has not been considered by the Commissioner and the Appeal Board." Syl. pt. 4, *Billings v. State Compensation Commissioner*, 123 W.Va. 498, 16 S.E.2d 804 (1941).

Therefore, for the foregoing reasons, we reverse the decision of the Appeal Board and remand the matter to the Commissioner for a determination consistent with the principles enunciated in this opinion.

Reversed and remanded with directions.